Mark Sayre #111168
VALOREM LAW GROUP LLP
29212 Las Brisas Road
Valencia, California 91354
mark.sayre@valoremlaw.com
(408) 940-0044 (telephone)
(408) 915-2672 (facsimile)

Nicole Auerbach, IL Bar No. 6217095 (*pro hac vice application pending)*
Daniel Wucherer, IL Bar No. 6304338 (*pro hac vice application pending)*
VALOREM LAW GROUP LLP
35 E. Wacker Dr., Suite 3000
Chicago, IL 60601
nicole.auerbach@valoremlaw.com
daniel.wucherer@valoremlaw.com
(312) 676-5460 (telephone)
(312) 676-5499 (facsimile)

*Attorneys for Schenker, Inc.*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SCHENKER, INC., a New York corporation,<br><br>Plaintiff,<br>v.<br><br>DARYL HE a/k/a WEN DA HE, individually, STEPHANIE KONG, individually, ACCURATE CARGO SERVICES, a California corporation, GEORGE HO, individually, and GEORGE HO d/b/a LEADER EXPEDITE,<br><br>Defendants. | **Case No. 2:16-cv-06321**<br><br>**SCHENKER, INC.'S COMPLAINT** |

Plaintiff SCHENKER, INC. ("Schenker"), a New York corporation, alleges as follows:

**INTRODUCTION**

1. From March 2011 to March 2013, the Defendants formed and associated with an enterprise ("the Enterprise") that stole hundreds of thousands of dollars from Schenker by conducting an illegitimate freight forwarding operation using Schenker's resources that provided revenue only to the associates of the Enterprise.

2. As explained in detail below, Defendant DARYL HE A/K/A WEN DA HE ("Defendant He") used to work for Schenker as an Ocean Import Manager. During the last two years of his employment before his resignation on March 10, 2013, Defendant He organized extensive freight forwarding services out of Schenker's office that he concealed from other Schenker employees. Specifically, Defendant He organized numerous ocean freight shipments from origins in Asia, primarily China, to various destinations in the United States. Defendant He also organized trucking services for numerous ocean containers already located in United States ports to be delivered to parties located in California and elsewhere. Defendant He received invoices from companies that performed these services and caused Schenker to pay those invoices.

3. After organizing these services, Defendant He should have sent invoices to other companies and individuals to collect revenue to cover the expenses he had caused Schenker to pay and make a profit. But Defendant He purposely did not do this, thus causing Schenker alone to pay the costs for the services and recoup no revenue. Instead, Defendant He sent numerous communications to Defendants Stephanie Kong, Accurate Cargo Services, George Ho, and George Ho d/b/a Leader Expedite – the other associates of the Enterprise – informing them of the progress of the services Defendant He had organized and when they were complete. Once these services were complete, the other Defendants sent invoices to third parties for the services Defendant He had performed and then divided the money among themselves and Defendant He after these invoices were paid. Defendant He and the other Defendants were thus able to keep for themselves all of the revenue generated by the fraudulent operation.

4. The actions of the Enterprise went undetected by Schenker for an extended period of time because Defendant He knowingly hid the expenses he had Schenker incur in Schenker's operational systems in a manner that evaded Schenker's internal controls. Defendant He did so by abusing his access rights to Schenker's shipment management system so that he could hide his illegitimate expenses in legitimate Schenker shipment files that had sufficient profit margins to absorb additional expenses and not trigger Schenker's internal controls. Defendant He also purposely failed to book and pay legitimate bills submitted to his department by service providers that had transported cargo for actual Schenker customers, which allowed him to hide additional expenses associated with the Enterprise's scheme in Schenker's operational systems.

5. The Defendants' scheme ceased to operate only when Defendant He abruptly resigned from Schenker on March 10, 2013 and was no longer able to organize shipments using Schenker's resources.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964, 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

7. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1367, because there is complete diversity between the parties and the amount in controversy, exclusive of interest and costs, is in excess of $75,000.

8. Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendant He is subject to personal jurisdiction in this judicial district and resides in this district. Defendants Stephanie Kong and George Ho also reside in this district and Defendants Accurate Cargo Services and George Ho d/b/a Leader Expedite transact business in this district.

9. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this district.

/

/

## THE PARTIES

**Schenker, Inc.**

10. Plaintiff Schenker is a New York corporation in the business of providing freight forwarding and logistics services to customers across the globe. These services include transporting freight by air, sea, and land, and providing customs clearance services. Schenker provides both import and export services. Schenker has numerous branch offices in the United States, including a branch office in Los Angeles. Schenker maintains several offices in the Los Angeles area to service its customers, including office locations in Carson, California.

**Daryl He**

11. Defendant He was hired by Schenker in June 2006 as an Ocean Import Coordinator. At all times relevant to this Complaint, Defendant He worked in one of the company's locations in Carson, California. Defendant He is a California resident.

**Accurate Cargo Services**

12. Defendant ACCURATE CARGO SERVICES ("Defendant ACS") is a California corporation formed in or about September 2011. According to California Secretary of State records, and publicly available information including Defendant ACS' website, Defendant ACS does business at 1493 N. Montebello Blvd., Suite 103, Montebello, California 90640.

13. According to its website (www.accuservicesusa.com), Defendant ACS is licensed by the Federal Maritime Commission as a Non-Vessel Operating Common Carrier, or "NVOCC," and as such "handle all kind of transportation job as a normal forwarding company, such as Ocean FCL, LCL, Air shipment, Trucking, Warehousing etc." (sic).

**Stephanie Kong**

14. Defendant STEPHANIE KONG ("Defendant Kong") is the president of Defendant ACS, according to publicly available information. Defendant Kong is also the designated agent for service of process for Defendant ACS according to California Secretary of State records. On information and belief, Defendant Kong is the sole owner of Defendant ACS. Defendant Kong is

named individually because she acted in her own capacity with respect to the scheme described in this complaint, in addition to causing Defendant ACS to take action with respect to the scheme.

15. Defendant Kong is a resident of California.

16. On information and belief, and based on a review of records including e-mails and Schenker personnel records, Defendant Kong and Defendant He are personal friends and have been such for numerous years.

**George Ho**

17. Defendant GEORGE HO ("Defendant Ho") previously worked at Schenker as a customs broker. His employment relationship with Schenker ended in or about March 2010, at which time Defendant Ho began doing business as "Leader Expedite."

18. Defendant Ho was, and possibly still is, associated with a company called Leader International. As described below, Defendant Ho used an e-mail address associated with this company shortly after his employment relationship with Schenker ended, and this company was involved with the shipments at issue in the Enterprise's scheme.

19. Defendant Ho is a resident of California.

**George Ho d/b/a Leader Expedite**

20. Defendant GEORGE HO D/B/A LEADER EXPEDITE ("Defendant Ho d/b/a Leader Expedite") provides customs clearance services and other cargo transportation services, such as trucking services. George Ho d/b/a Leader Expedite and George Ho, individually, conduct business at 22930 Crenshaw Blvd., Torrance, California 90505.

21. On information and belief, Defendant Ho still does business as Leader Expedite or is affiliated with or is employed by a business enterprise going by that d/b/a name.

## THE SCHEME

**Shipments to Bakersfield, California**

22. Beginning in March 2011, the Defendants formed and associated with the Enterprise that defrauded Schenker of hundreds of thousands of dollars. The Enterprise accomplished this feat through at least two different methods, the first of which is described here.

23. In September 2010, Defendant He was promoted by Schenker to the position of Ocean Import Manager – LCL. The "LCL" portion of this title stands for "Less Than Container Load." Defendant He's specific duties related to cargo being imported into the United States that had been transported by ocean carriers from origins outside the United States.

24. As a manager of "Less Than Container Load" shipments, Defendant He managed shipments where several individual shipments, typically from several different customers, are grouped together to fill an ocean container, which is then loaded on a cargo vessel for transportation. This process is called "consolidation."

25. Starting in or about November 2011, and lasting through approximately August 2012, Defendant He, in his position as Ocean Import Manager, instructed trucking companies (usually a company called RoadEx America Inc. ("RoadEx")) to pick up and deliver approximately 164 full ocean containers to a delivery party in Bakersfield, California called Sunshine Metal Clad, Inc. ("the Bakersfield Shipments"). Defendant He caused Schenker to pay the trucking companies for these delivery services.

26. Defendant He ordered these services by using his Schenker e-mail account and other Schenker resources to issue a Schenker Delivery Order to the trucking companies (usually RoadEx). The Delivery Order contained details regarding the container, such as its unique container number, location of the container, ocean carrier name, house and master bill of lading number, delivery address, description of the cargo, weight of the container, and other such information.

27. Defendant He used his Schenker e-mail account to communicate frequently with RoadEx to ensure the trucking services were performed in a satisfactory manner and in accordance with expectations regarding timing and related aspects.

28. Upon completion of the delivery, RoadEx issued invoices to Schenker for its services. Based on a review of invoices issued by RoadEx for the Bakersfield Shipments, Defendant He caused Schenker to pay RoadEx in excess of $127,000 for the Bakersfield Shipments.

29. When he ordered these services, Defendant He should have opened a file in Schenker's transportation management system for each shipment. In each shipment file Defendant He should have booked all expenses incurred (e.g., the trucking costs) and all revenue collected in connection with transporting the containers to their delivery party. Defendant He, however, never opened any such files. Instead, Defendant He booked all of the expenses in other, wholly unrelated Schenker shipment files. Defendant He did this to *hide* the expenses in legitimate Schenker files that had sufficient profit margins to absorb additional expense without triggering Schenker's internal accounting controls. Accordingly, Defendant He caused Schenker to pay the costs for the Bakersfield Shipments but never collected any revenue for Schenker.

30. Defendant Ho, and Defendant Ho d/b/a/ Leader Expedite, however, did collect revenue from the Bakersfield Shipments. Before Defendant He arranged and oversaw delivery services relating to the Bakersfield Shipments, a company called ATA Logistics, Inc. ("ATA Logistics") engaged Leader Expedite to arrange the delivery of the Bakersfield Shipments. ATA Logistics served as the usual forwarder for the supplier of the goods in the Bakersfield Shipments. Defendant Ho and Defendant Ho d/b/a Leader Expedite did not arrange the delivery of the Bakersfield Shipments; Defendant He instead did this and caused Schenker to pay for the delivery services. But after these services were complete, Defendant Ho and Defendant Ho d/b/a Leader Expedite obtained revenue for the Enterprise by submitting invoices to ATA Logistics. Two examples are as follows:

a. On or about December 9, 2011, Leader Expedite issued an invoice to ATA Logistics for $4,905.00. The description of services rendered on the December 9 invoice was "trucking fee." The invoice lists nine (9) ocean containers, identified by unique ocean container numbers, delivered to "Bakerfield (sic), CA 93307." The invoice also contains other unique identifying information, such as the bill of lading number, the vessel name and voyage number, and a description of the cargo. All of these details match exactly with invoices that were issued to Schenker by RoadEx for

RoadEx's pick up and delivery of this same cargo, and ATA Logistics paid the December 9, 2011 invoice to Leader Expedite.

b. On or about December 27, 2011, Leader Expedite issued another invoice to ATA Logistics for $5,450.00. The description of services rendered was "trucking fee." The invoice lists ten (10) ocean containers, identified by unique ocean container numbers, delivered to "Bakerfield (sic), CA 93307." The invoice also contains other unique identifying information, such as the bill of lading number, the vessel name and voyage number, and a description of the cargo. All of these details again match exactly with invoices that were issued to Schenker by RoadEx for RoadEx's pick up and delivery of this same cargo, and ATA Logistics paid the December 27, 2011 invoice to Leader Expedite.

31. In the two examples discussed above, Schenker paid in excess of $14,600 to RoadEx for the trucking services RoadEx had provided but Defendant He never collected any revenue for Schenker, resulting in a total loss to Schenker. The invoices issued by Defendant Ho d/b/a Leader Expedite to ATA Logistics total only $10,355. This reveals how this method of the Enterprise's scheme worked—the Defendants offered their "customers" very low rates for services because they knew Schenker would be stuck with the cost, but collect no revenue. For the Defendants it resulted in 100% profit of the low prices the Enterprise charged and collected.

32. Later, in the course of investigating the December 9, 2011 and December 27, 2011 invoices that Leader Expedite submitted to ATA Logistics, Schenker communicated with Defendant Ho. Defendant Ho admitted to Schenker that Leader Expedite had invoiced ATA Logistics for delivery services relating to the Bakersfield Shipoments. Defendant Ho also asserted that, rather than arranging the delivery services himself, he had instead contacted Defendant ACS and requested that Defendant ACS arrange the delivery services. When Defendant Ho learned that Schenker had emails showing that Defendant He had in fact organized the services and caused Schenker to pay the expenses, Defendant Ho ceased communicating with Schenker.

33. Additional evidence beyond Defendant Ho's assertion to Schenker also establishes Defendant Kong's and Defendant ACS' involvement in the Bakersfield Shipments. While Defendant He was arranging and overseeing the delivery of the Bakersfield Shipments, Defnedant He sent numerous email-communications to Defendant Kong and Defendant ACS. Three examples are as follows:

a. On February 17, 2012, Defendant He used his Schenker e-mail account to send Defendant Kong a proof of delivery document, wherein his message to Defendant Kong reads, "Here you go one (sic), will provide you another one shortly." Attached to this e-mail is a proof of delivery issued by RoadEx to show that a specific container had been delivered to Sunshine Metal on February 16, 2012.

b. On February 20, 2012, Defendant He used his Schenker e-mail account to send Defendant Kong a proof of delivery document, wherein he did not include a message. Attached to this e-mail is a proof of delivery issued by RoadEx to show that a specific container had been delivered to Sunshine Metal on February 16, 2012.

c. On March 12, 2012, Defendant He used his Schenker e-mail account to send Defendant Kong proof of delivery documents, wherein he did not include a message. Attached to this e-mail are four proofs of delivery issued by RoadEx to show that four specific containers had been delivered to Sunshine Metal – one on March 5, 2012, and three on March 6, 2012.

34. The proofs of delivery sent to Defendants Kong and ACS by Defendant He relate directly to Bakersfield Shipments that Defendant He caused Schenker to pay RoadEx to pick and deliver. This is clear from the details contained in the proofs of delivery such as the container number, bill of lading number, commodity description, and other such information.

35. The only reason Defendant He would send these e-mails with shipment documentation to Defendant Kong and Defendant ACS would be so that they, like Defendant Ho and Defendant Ho d/b/a Leader Expedite, could use the information to collect revenue for services that Defendant He caused Schenker to pay for. Defendant He never had Schenker bill Defendant

Kong or Defendant ACS for any services relating to the Bakersfield Shipments, and he also did not bill Defendant Ho or Defendant Ho d/b/a Leader Expedite for any services. Defendant He never collected any revenue for Schenker relating to the Bakersfield Shipments. The Defendants instead worked together to cause Schenker to absorb the expenses for the Bakersfield Shipments while collecting the revenue for the Enterprise.

36. As stated above, this one example of this method used by the Enterprise to defraud Schenker caused a loss to Schenker in excess of $127,000.

**Ocean Shipments from China**

37. The Enterprise also used a second method to defraud Schenker between March 2011 and March 10, 2013. Similar to the method used with the Bakersfield Shipments, Defendant He arranged for and caused Schenker to pay for shipments that originated from China, except that for these shipments Defendant He also caused Schenker to pay for various ocean transportation, port-related, customs-related, and storage expenses in addition to trucking delivery expenses. Defendant He then provided unique identifying information for these shipments to the other Defendants, who in turn invoiced third parties for transporting the shipments and collected revenue for the Enterprise. Defendant He, however, did not send invoices from Schenker to the other Defendants or any other third parties to collect revenue for Schenker from these shipments.. Thus, the Enterprise was again able to obtain all of the revenue generated from these shipments while Schenker obtained no revenue and paid all of the costs.

38. In or about March 2011, Defendant He took a three-week vacation to China. Shortly before this, on February 22, 2011, Defendant He used his Schenker e-mail account to send a message to his personal Yahoo! e-mail account (daryl0918@yahoo.com) with contact details for a person named Peng Huang who worked in the Shenzhen branch office of a company called China Container Line ("CCL Shenzhen"). Attached to this e-mail that Defendant He sent to himself was a document showing the location and other details of CCL Shenzhen.

39. Defendant He then proceeded to develop a business relationship with Peng Huang and CCL Shenzhen. Shortly after he returned from China, Defendant He began using his Schenker

position, office, and resources to organize ocean shipments from China (usually, but not always, Shenzhen, China) to the United States and consequently received invoices from Peng Huang of CCL Shenzhen for those ocean shipments ("Shenzhen Shipments"). As described in the paragraphs that follow, Defendant He caused Schenker to pay for the Shenzhen Shipments and hid those expenses in Schenker's operational systems, but he never collected revenue on behalf of Schenker. Instead, Defendant He and the other Defendants worked together to defraud Schenker and keep all the revenue from the Shenzhen Shipments for themselves.

40. Documents, including e-mails and shipment documentation, show that Defendant Ho and Defendant Ho d/b/a Leader Expedite acted together with Defendant He to defraud Schenker by causing it to pay for the Shenzhen Shipments while the Enterprise collected all of the revenue generated by those shipments.

a. Shortly after Defendant Ho's employment with Schenker ended, he sent Defendant He an e-mail on March 22, 2010, with his new contact details. This e-mail went to Defendant He's Schenker e-mail address and came from george@leaderintl.com and contained a signature block that reads as follows:

> "George Ho
> Leader Expedite
> 17008 Evergreen Place #D200
> City of Industry, California 91745"

b. Defendant He used his Schenker e-mail account to forward this message to himself at his private Yahoo! account on March 23, 2010. Defendant He's Schenker e-mail activity shows this self-forwarding practice as a pattern when it comes to the Shenzhen Shipments—he routinely forwarded any e-mails related to those shipments to his personal Yahoo! e-mail account. There is no legitimate business reason for Defendant He to have done this.

c. Several of the Shenzhen Shipments that Defendant He organized were for a consignee party named Metro Vista, Inc., located at 114 E. Adams Avenue, Alhambra, CA 91801. The telephone number for this entity on the shipment

documentation (e.g., the bill of lading) is the same as that provided by Defendant Ho to Defendant He on March 22, 2010, and in fact reads "CONTACT: GEORGE TEL: [telephone number]." Further, Defendant He used his Schenker e-mail account to communicate with a person named "Clark" about these shipments. This person "Clark" had the following e-mail address: clark@leaderintl.com – the e-mail extension for this individual (@leaderintl.com) is the same as that used by Defendant Ho in his March 22, 2010, e-mail to Defendant He.

d. Defendant Ho and Defendant Ho d/b/a Leader Expedite also routinely performed customs clearance services in connection with the Shenzhen Shipments. Defendant He was in frequent e-mail communication with Defendant Ho and Defendant Ho d/b/a Leader Expedite regarding these shipments.

41. Documents and e-mails also show that Defendant Kong and Defendant ACS are connected to the Shenzhen Shipments and acted together with Defendant He to defraud Schenker by causing it to pay for the Shenzhen Shipments while the Enterprise collected all of the revenue generated by those shipments.

a. Defendant He used his Schenker e-mail account to send Defendants Kong and ACS documentation related to the Shenzhen Shipments. As an example, Defendant He routinely used his Schenker e-mail account to send arrival notices to Defendant Kong. The only reason Defendant He would send Defendant Kong or Defendant ACS documentation of this nature would be so that they, like George Ho and George Ho d/b/a Leader Expedite had done with information that Defendant He provided relating to the Bakersfield Shipments, could use the information to collect revenue for services relating to the Shenzhen Shipments that Defendant He caused Schenker to pay for.

42. Defendant He received invoices from CCL Shenzhen in connection with the Shenzhen Shipments ("Shenzhen Invoices"). Defendant He caused Schenker to pay those invoices in two separate ways described in the following paragraphs.

43. *The Offset Approach.* From when the Enterprise first began defrauding Schenker with the Shenzhen Shipments in March 2011 until approximately April 2012, Defendant He used his Schenker e-mail account to instruct CCL Shenzhen's affiliate in the Los Angeles area ("CCL Los Angeles") to offset the Shenzhen Invoices against payments that were due to Schenker. Defendant He was able to do this because, at the time, CCL Los Angeles and Schenker were working together on legitimate business transactions also involving shipments from China (but not Shenzhen). On a monthly basis, CCL Los Angeles owed Schenker for services that Schenker rendered in connection with that legitimate business. Defendant He used this legitimate source of revenue for Schenker to offset, and therefore hide, his Shenzhen Invoices.

44. For example, on June 7, 2011, Defendant He sent CCL Los Angeles an e-mail with the following message:

> "Dear Stephanie:
>
> Attached are the invoices that I need to pay CCL Shenzhen office, Pls kindly help to process the payment to CCL Shenzhen office and deduct the amount from the monthly check payment.
>
> Thank you so much for your helps (sic)!!"

Attached to that e-mail from Defendant He were seven Shenzhen Invoices relating to seven different shipments, totaling $2,111.20. The impact, therefore, was to deprive Schenker of $2,111.20 in legitimate revenue while allowing Defendant He and the other Defendants to continue to carry out their scheme without detection.

45. Defendant He used this offset approach repeatedly—generally on a monthly basis—up until approximately April 2012. Defendant He never created Schenker shipment files for these shipments, and he was careful to exclude all other Schenker employees from the Shenzhen Shipments. As such he was able to make them essentially disappear, or so he thought. Despite his efforts to erase it, the e-mail trail Defendant He left behind lays bare the scheme carried out by the Enterprise.

46. The available evidence indicates that the invoices Defendant He offset against legitimate Schenker revenue totaled approximately $30,000. The damage is much greater, however, because the Shenzhen Invoices only account for the cost of ocean transportation and expenses incidental to the ocean voyage. Defendant He also used his Schenker position to arrange for destination services for the Shenzhen Shipments, such as customs clearance, port fees, storage fees, and trucking services to the final destination in the United States. Defendant He received invoices from third parties who performed these services and, like he did with the invoices from RoadEx relating to the Bakersfield Shipments, Defendant He caused Schenker to pay these invoices and then hid those paid expenses in unrelated shipping files to conceal them fron Schenker. The amounts of these invoices will be calculated and proven at trial, but will add many thousands of dollars to the loss suffered by Schenker and caused by Defendant He and the Enterprise.

47. *The Schenker Check Approach*. Starting in or about April 2012, Defendant He could no longer offset the Shenzhen Invoices against legitimate revenue because the Shenzhen Invoices exceeded the revenue due to Schenker from CCL Los Angeles. Accordingly, the Enterprise needed a new way to pay for the Shenzhen Invoices, and Defendant He decided to do this by paying the invoices with checks issued on Schenker's bank account.

48. The tipping point came in March 2012, evidenced by an e-mail Defendant He sent to Lucy Chen of CCL Los Angeles on April 4, 2012:

> "Dear Lucy,
>
> Pls see attached pending invoices from CCL SZX [Shenzhen] to Schenker LAX. Pls kindly help to pay CCL SZX and deduct the balance from the March payment, I know it might not be able to cover the full amount of these invoices, so you can issue me invoice of the balance and I will cut check to you for those invoices from you to clear this up."

49. The Shenzhen Invoices attached to Defendant He's April 4 e-mail totaled $15,801.60. However, in subsequent e-mail communications with CCL Los Angeles, Lucy Chen informed Defendant He that the revenue due to Schenker could cover only $4,131.09 of that

amount. Accordingly, on April 17, 2012, Defendant He asked Lucy Chen of CCL Los Angeles to issue invoices to Schenker to cover the difference of $11,670.51 and told her that he could "cut check to you right away."

50. As a manager Defendant He had check signing authority up to $15,000, provided another manager with check signing authority also signed the check. If the check amount exceeded the limit, a next-level manager had to approve the check. Defendant knew of this requirement, and so he was always careful to: (i) stay under the limit, and (ii) ask another manager in the office who was not in a position to question the purpose of the check to be the second signatory.

51. On May 1, 2012, Defendant He sent an e-mail to Lucy Chen of CCL Los Angeles to inform her that he had issued two Schenker checks totaling $11,670.51 and would send them by overnight service. Defendant He provided a UPS tracking number.

52. Indeed, Defendant He caused two checks to be issued—check number 551165264 in the amount of $5,347.37, and check number 551165252 in the amount of $6,323.14. These were sent to and deposited by CCL Los Angeles to cover Defendant He's Shenzhen Invoices.

53. This pattern continued for many months and Defendant He caused Schenker checks to be issued to CCL Los Angeles totaling more than $315,000. Just days before his sudden resignation, Defendant He caused Schenker to issue three checks totaling $31,636 to CCL Los Angeles to cover numerous Shenzhen Shipments. Several of these shipments had been sent to Metro Vista, Inc., further establishing Defendant Ho and Defendant Ho d/b/a Leader Expedite's involvement with the Shenzhen Shipments..

54. Defendant He hid all of these payments and the Shenzhen Shipments in legitimate Schenker shipment files that had sufficient revenue to cover additional expense without triggering Schenker's internal accounting controls.

55. In addition, Schenker management also discovered after Defendant He's resignation that he had failed to pay Schenker vendors who had performed legitimate services for Schenker, thus allowing the Enterprise to continue defrauding Schenker for longer than it would otherwise have been able to do. By not booking the legitimate expenses in Schenker's systems, Defendant

He was able to artificially keep these vendors' accounts in the positive and thus increase the number of shipment files where he could hide the payments he had Schenker make for the Shenzhen Shipments while the Enterprise received the revenue from those shipments.

56. As with the damage caused to Schenker by the Offset Approach, the damage caused to Schenker by the Schenker Check Approach is more than merely the total of the checks. That is because the Shenzhen Invoices that Defendant He caused Schenker to pay only account for the cost of ocean transportation and expenses incidental to the ocean voyage. But Defendant He also Defendant He also used his Schenker position to arrange for destination services for the Shenzhen Shipments, such as customs clearance, port fees, storage fees, and trucking services. The amounts of these invoices will be calculated and proven at trial, but will many add thousands of dollars to the loss suffered by Schenker.

57. Tellingly, shipments fitting the pattern described above ceased immediately after Defendant He resigned from Schenker. This prompted "Paul" at CCL Shenzhen to send Defendant He an e-mail on March 11, 2013, with the message: "Hi Daryl. Lont (sic) time no booking,pls advise if any problem. thank you." The bookings stopped, of course, because Defendant He was no longer with Schenker and could not organize shipments from Shenzhen to provide revenue for the Enterprise while defrauding Schenker.

**Schenker's discovery of the fraud**

58. By e-mail at 11:12 p.m. on Sunday, March 10, 2013, Defendant He abruptly resigned from his position at Schenker. Defendant He never returned to work at Schenker, and instead joined Defendant ACS. Defendant He currently holds himself out as a Vice President of Defendant ACS.

59. At the time of his resignation, Defendant He knew that the Enterprise's scheme to steal from Schenker would be discovered over time. Defendant He also knew that the legitimate bills submitted by service providers he had failed to pay were mounting, he had run out of ways to defer them, and he had no place to book them within Schenker's systems without triggering shipment-level losses, which would in and of itself cause management to investigate and ultimately

piece together the fraud carried out by the Enterprise.

60. As described above, Defendant He took great steps to hide evidence of the Enterprise's fraud in various unrelated and sometimes closed files so that Schenker could not readily detect what had happened. As a result, it took Schenker a great deal of time and effort to match the anomalies it began to uncover with the scheme that the Enterprise had carried out. Defendant He also made the process of uncovering the fraud much more difficult by deleting emails in his Schenker email account and using his personal Yahoo email account (to which Schenker has no access) whenever he could to carry out his part of the Enterprise's scheme.

61. Because of the steps Defendant He took to conceal evidence of the Enterprise's fraud, it was very difficult for Schenker to learn that Defendant He had been organizing ocean shipments and trucking services for which Schenker had not been received any revenue. At first Schenker managers thought simply that Defendant He had poorly organized the shipping files he oversaw. It was only after extensive, time consuming work in Schenker's operational system and tracking down third parties who were connected to the invoices for the Bakersfield and Shenzhen Shipments that Schenker discovered that Defendant He and the other Defendants had been participating in a highly coordinated scheme to defraud Schenker.

**COUNT I**

**RICO § 1962(c)**

62. The allegations of paragraphs 1 through 61 are incorporated herein by reference.

63. This Count is against all of the named Defendants.

64. Beginning in March 2011, the Defendants formed an enterprise that consisted of a group of individuals associated in fact. The common purpose of the enterprise was to defraud Schenker by having Schenker pay for freight forwarding services that provided revenue only to the enterprise.

65. The Defendants associated with the enterprise from March 2011 until approximately March 10, 2013. During this period, the Defendants functioned as a continuous unit wherein Defendant He organized and paid for freight forwarding services using Schenker's resources while

informing the other Defendants of the progress of the services Defendant He had organized and when they were complete. Once these services were complete, the other Defendants sent invoices to third parties for the services Defendant He had performed that included unique identifying information for the shipments that had been transported. After these invoices were paid, the other Defendants divided the money between themselves and Defendant He while Schenker itself received no revenue because Defendant He did not cause Schenker to issue invoices for these services and hid the evidence that the services had ever been performed. In this way, the enterprise operated with ongoing organization and was able to continuously commit numerous predicate acts over a 2-year period.

66. The activities of the enterprise, which included organizing and sending fraudulent invoices for freight forwarding services that crossed state borders and entered the United States from China, affected interstate commerce.

67. The Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Schenker.

68. Pursuant to and in furtherance of their fraudulent scheme, the Defendants committed acts of wire fraud, 18 U.S.C. § 1341, and mail fraud, 18 U.S.C. § 1343, including but not limited to the acts detailed below in paragraph 68(c).

a. The Defendants formed a scheme to defraud Schenker by causing Schenker to pay for freight forwarding services while the Defendants received the revenue from those same services by sending invoices to the third parties that had requested the services..

b. The Defendants each had a specific intent to deceive and defraud Schenker by carrying out this scheme.

c. Each of the Defendants used or caused a use of the United States wires and/or mail in furtherance of the scheme:

    i. On December 14, 2011, Defendant He sent an email to Nicolas Sims of a

trucking company, RoadEx America ("RoadEx"), requesting that RoadEx deliver nine containers to Sunshine Metal in Bakersfield, CA. Attached to the email was a Schenker delivery order for the containers that included information such as their unique container numbers, the location of the containers, ocean carrier name, house and master bill of lading number, delivery address, description of the cargo, and weight of the containers. This email was sent in furtherance of the Enterprise's scheme because it caused RoadRx to perform services on Schenker's behalf and later send an invoice for the services to Schenker, which Defendant He caused Schenker to pay. Defendant He knew when sending the email that the other Defendants would send invoices relating to these services to third parties that requested the services, but that Defendant He would not in turn send invoices from Schenker to the other Defendants or any other third party to collect revenue for Schenker. Defendant He thus knew that after RoadEx performed the services he requested, the Enterprise would unjustly enrich itself at the expense of Schenker.

ii. On April 14, 2012, Defendant He sent an email to Nicolas Sims requesting that RoadEx deliver two containers to Sunshine Metal in Bakersfield, CA. Attached to the email was a Schenker delivery order for the containers that included information such as their unique container numbers, the location of the containers, ocean carrier name, house and master bill of lading number, delivery address, description of the cargo, and weight of the containers. This email was sent in furtherance of the Enterprise's scheme because it caused RoadRx to perform services on Schenker's behalf and later send an invoice for the services to Schenker, which Defendant He caused Schenker to pay. Defendant He knew when sending the email that the other Defendants would send invoices relating to these services to third parties that requested the

services, but that Defendant He would not in turn send invoices from Schenker to the other Defendants or any other third party to provide revenue for Schenker. Defendant He thus knew that after RoadEx performed the services he requested, the Enterprise would unjustly enrich itself at the expense of Schenker.

iii. On February 8, 2012, Defendant He sent an email to Etsuko Masaki, another Schenker employee, asking her to pay invoices that had been received from RoadEx. Attached to the email were invoices that Schenker had received from RoadEx for trucking delivery services related to the Bakersfield Shipments that RoadEx had completed at Defendant He's request. This email was sent in furtherance of the Enterprise's scheme because it caused Schenker to pay for the RoadEx services, while Defendant He knew when sending the email that Schenker would obtain no revenue from the services because he had hidden them in unrelated shipping files and would not issue any invoices from Schenker to third parties for the services to collect revenue for Schenker. Defendant He thus knew thatSchenker would suffer a 100% loss by paying the invoices and the Enterprise would earn 100% of the revenue generated by the services RoadEx had completed.

iv. On or about December 9, 2011, Defendant Ho d/b/a Leader Expedite mailed an invoice to ATA Logistics for $4,905.00. The invoice lists nine ocean containers, identified by unique ocean container numbers, delivered to "Bakerfield (sic), CA 93307." The invoice also contains other unique identifying information, such as the bill of lading number, the vessel name and voyage number, and a description of the cargo. All of these details match exactly with invoices that were issued to Schenker by RoadEx for RoadEx's pick up and delivery of this same cargo. When mailing this invoice, Defendant Ho d/b/a Leader Expedite knew that Defendant He had

arranged and overseen the delivery of these shipments using Schenker resources. Defendant Ho d/b/a Leader Expedite also knew that Defendant He would not cause Schenker to issue any invoices to Leader Expedite or any third parties that would enable Schenker to collect revenue for the services Defendant He had performed. Defendant Ho d/b/a Leader Expedite thus knew that Schenker would receive no revenue for these services and that only the Enterprise—when ATA Logistics paid the invoice issued by Leader Expedite—would receive that revenue. Defendant Ho d/b/a Leader Expedite also knew that Schenker had paid RoadEx significantly more for the trucking services RoadEx had provided than Leader Expedite's December 9, 2011 invoice charged ATA Logistics for the delivery of the same underlying shipments. This use of the United States mail thus furthered the Enterprise's scheme not only by causing ATA Logistics to pay the Enterprise for services that Defendant He had fraudulently arranged, but also by misrepresenting the costs associated with delivery of the underlying shipments to entice ATA Logistics to pay Leader Expedite and the Enterprise for the services. The invoice offered an absurdly low rate for the services because Defendant Ho d/b/a Leader Expedite knew that Schenker would pay all of the costs associated with the services.

v. On or about December 27, 2011, Defendant Ho d/b/a Leader Expedite mailed an invoice to ATA Logistics for $5,405.00. The invoice lists ten ocean containers, identified by unique ocean container numbers, delivered to "Bakerfield (sic), CA 93307." The invoice also contains other unique identifying information, such as the bill of lading number, the vessel name and voyage number, and a description of the cargo. All of these details match exactly with invoices that were issued to Schenker by RoadEx for RoadEx's pick up and delivery of this same cargo. When mailing this

invoice, Defendant Ho d/b/a Leader Expedite knew that Defendant He had arranged and overseen the delivery of these shipments using Schenker resources. Defendant Ho d/b/a Leader Expedite also knew that Defendant He would not cause Schenker to issue any invoices to Leader Expedite or any third parties that would enable Schenker to collect revenue for the services Defendant He had performed. Defendant Ho d/b/a Leader Expedite thus knew that Schenker would receive no revenue for these services and that only the Enterprise—when ATA Logistics paid the invoice issued by Leader Expedite—would receive that revenue. Defendant Ho d/b/a Leader Expedite also knew that Schenker had paid RoadEx significantly more for the trucking services RoadEx had provided than Leader Expedite's December 9, 2011 invoice charged ATA Logistics for the delivery of the same underlying shipments. This use of the United States mail thus furthered the Enterprise's scheme not only by causing ATA Logistics to pay the Enterprise for services that Defendant He had fraudulently arranged, but also by misrepresenting the costs associated with delivery of the underlying shipments to entice ATA Logistics to pay Leader Expedite and the Enterprise for the services. The invoice offered an absurdly low rate for the services because Defendant Ho d/b/a Leader Expedite knew that Schenker would pay all of the costs associated with the services.

vi. On February 17, 2012, Defendant He sent an email to Defendant Kong that attached a proof of delivery document showing that RoadEx had delivered a container to Sunshine Metal in Bakersfield, CA on February 16, 2012. The proof of delivery included extensive details, such as the container number, bill of lading number, and commodity description. An accompanying message from Defendant He read "Here you go one (sic), will provide you another one shortly." This email was sent in furtherance of the Enterprise's

scheme because it notified Defendant Kong and Defendant ACS that, now that delivery was complete, the Enterprise could send an invoice for the delivery of the container to third parties that had requested the delivery. Defendant He knew when sending this email that he would not send invoices from Schenker to the other Defendants or any other third party to collect any revenue for Schenker for the delivery. Defendant He thus knew that the Enterprise would unjustly enrich itself at the expense of Schenker after invoices the other Defendants sent were paid.

vii. On February 20, 2012, Defendant He sent an email to Defendant Kong that attached a proof of delivery document showing that RoadEx had delivered a container to Sunshine Metal in Bakersfield, CA on February 16, 2012. The proof of delivery included extensive details, such as the container number, bill of lading number, and commodity description. This email was sent in furtherance of the Enterprise's scheme because it notified Defendant Kong and Defendant ACS that, now that delivery was complete, the Enterprise could send an invoice for the delivery of the container to third parties that had requested the delivery. Defendant He knew when sending this email that he would not send invoices from Schenker to the other Defendants or any other third party to collect any revenue for Schenker for the delivery. Defendant He thus knew that the Enterprise would unjustly enrich itself at the expense of Schenker after invoices the other Defendants sent were paid.

viii. On March 12, 2012, Defendant He sent an email to Defendant Kong that attached a proof of delivery document showing that RoadEx had delivered one container to Sunshine Metal in Bakersfield, CA on March 5, 2012 and had three containers to Sunshine Metal in Bakersfield, CA on March 6, 2012. The proof of delivery included extensive details, such as the container numbers, bill of lading numbers, and commodity descriptions. This email

was sent in furtherance of the Enterprise's scheme because it notified Defendant Kong and Defendant ACS that, now that delivery was complete, the Enterprise could send an invoice for the delivery of the container to third parties that had requested the delivery. Defendant He knew when sending this email that he would not send invoices from Schenker to the other Defendants or any other third party to collect any revenue for Schenker for the delivery. Defendant He thus knew that the Enterprise would unjustly enrich itself at the expense of Schenker after invoices the other Defendants sent were paid.

ix. On May 26, 2011, Defendant He sent an email to Peng Huang of CCL Shenzhen inquiring about ocean shipments Defendant He had caused CCL Shenzhen to send to the United States from China under his authority as an Ocean Import Manager with Schenker. This is one example of dozens of emails Defendant He sent to Peng Huang between approximately March 2011 and March 2013 in regard to shipments Defendant He had ordered from CCL Shenzhen and then actively concealed from Schenker by hiding evidence of the shipments in unrelated shipping files. These emails were sent in furtherance of the Enterprise's scheme because they caused CCL Shenzhen to perform services for Schenker and later send invoices for those services to Schenker. But Defendant He knew that Schenker would never receive any revenue from these services because he would not send invoices from Schenker to any third party to collect any revenue for Schenker for these services. Instead, Defendant He knew that the other Defendants would send invoices relating to these services to third parties, resulting in the Enterprise obtaining all the revenue from these services while Schenker paid all of the costs.

x. On July 7, 2011, Defendant He sent an email to Defendant Kong attaching

an arrival notice for a shipment that CCL Shenzhen had transported from China to the United States after Defendant He organized the shipment. This email was sent in furtherance of the Enterprise's scheme because it notified Defendant Kong and Defendant ACS that, now that delivery was complete, the Enterprise could send an invoice for transportation and delivery of the shipment to third parties that had requested these services. Defendant He knew when sending this email that he would not send invoices from Schenker to the other Defendants or any other third party to collect any revenue for Schenker for these services. Defendant He thus knew that the Enterprise would unjustly enrich itself at the expense of Schenker after invoices the other Defendants sent were paid.

xi. On September 23, 2011, Defendant He sent an email to Defendant Kong attaching an arrival notice for a shipment that CCL Shenzhen had transported from China to the United States after Defendant He organized the shipment. This email was sent in furtherance of the Enterprise's scheme because it notified Defendant Kong and Defendant ACS that, now that delivery was complete, the Enterprise could send an invoice for transportation and delivery of the shipment to third parties that had requested these services. Defendant He knew when sending this email that he would not send invoices from Schenker to the other Defendants or any other third party to collect any revenue for Schenker for these services. Defendant He thus knew that the Enterprise would unjustly enrich itself at the expense of Schenker after invoices the other Defendants sent were paid.

xii. On June 7, 2011, Defendant He sent an email to Stephanie Fang of CCL Los Angeles attaching seven invoices Schenker had received from CCL Shenzhen for services relating to the Shenzhen Shipments and requesting that CCL Los Angeles deduct the total amount of the invoices from money

that CCL Los Angeles owed to Schenker. This email misrepresented that Schenker had organized the services that CCL Shenzhen had performed and invoiced Schenker for, when in fact Defendant He knew that Schenker had no knowledge of these services and the Enterprise would receive all of the revenue generated from the services. This email also furthered the Enterprise's scheme because it caused CCL Los Angeles to resolve the invoice Schenker had received from CCL Shenzhen, which hid from Schenker the fact that Defendant He had caused it to organize and be invoiced for services relating to the Shenzhen Shipments.

xiii. On September 1, 2011, Defendant He sent an email to Lucy Chen of CCL Los Angeles attaching three invoices Schenker had received from CCL Shenzhen for services relating to the Shenzhen Shipments and requesting that CCL Los Angeles deduct the total amount of the invoices from money that CCL Los Angeles owed to Schenker. This email misrepresented that Schenker had organized the services that CCL Shenzhen had performed and invoiced Schenker for, when in fact Defendant He knew that Schenker had no knowledge of these services and that the Enterprise would receive all of the revenue generated from the services. This email also furthered the Enterprise's scheme because it caused CCL Los Angeles to resolve the invoice Schenker had received from CCL Shenzhen, which hid from Schenker the fact that Defendant He had caused it to organize and be invoiced for services relating to the Shenzhen Shipments.

xiv. On February 29, 2012, Defendant He sent an email to Lucy Chen of CCL Los Angeles attaching four invoices Schenker had received from CCL Shenzhen for services relating to the Shenzhen Shipments and requesting that CCL Los Angeles deduct the total amount of the invoices from money that CCL Los Angeles owed to Schenker. This email misrepresented that

Schenker had organized the services that CCL Shenzhen had performed and invoiced Schenker for, when in fact Defendant He knew that Schenker had no knowledge of these services and that the Enterprise would receive all of the revenue generated from the services. This email also furthered the Enterprise's scheme because it caused CCL Los Angeles to resolve the invoice Schenker had received from CCL Shenzhen, which hid from Schenker the fact that Defendant He had caused it to organize and be invoiced for services relating to the Shenzhen Shipments.

xv. On April 4, 2012, Defendant He sent an email to Lucy Chen of CCL Los Angeles attaching nine invoices Schenker had received from CCL Shenzhen for services relating to the Shenzhen Shipments and requesting that CCL Los Angeles deduct the total amount of the invoices from money that CCL Los Angeles owed to Schenker. Defendant He added, however, that if CCL Los Angeles did not owe enough money to Schenker to cover the invoices, CCL Los Angeles should issue an invoice for the remaining balance and Defendant He would "cut" a check to CCL Los Angeles "to clear this up." This email again misrepresented that Schenker had organized the services that CCL Shenzhen had performed and invoiced Schenker for, when in fact Defendant He knew that Schenker had no knowledge of these services and that the Enterprise would receive all of the revenue generated from the services. This email also furthered the Enterprise's scheme because it established a method of payment that Defendant He would continue for many months wherein he sent checks drawn from Schenker's bank account to CCL Los Angeles in order to pay invoices that Schenker had received from CCL Shenzhen. Establishing this system of payment made it easier for Defendant He to obtain approval from a second manager for the checks he prepared, because a Schenker check made out to the CCL affiliate in Los

Angeles did not attract the same level of scrutiny that a check made out to CCL Shenzhen would have.

xvi. On July 10, 2012, Defendant He sent an email to Lucy Chen of CCL Los Angeles attaching three invoices Schenker had received from CCL Shenzhen. In the email Defendant He requested that Ms. Chen "issue 3 different invoices for above 3 attachments to me," after which "I will issue checks for these invoices to you by 7/15." This email again misrepresented that Schenker had organized the services that CCL Shenzhen had performed and invoiced Schenker for, when in fact Defendant He knew that Schenker had no knowledge of these services and that the Enterprise would receive all of the revenue generated from the services. This email also furthered the Enterprise's scheme by causing CCL Los Angeles to issue invoices to Schenker in place of the invoices that CCL Shenzhen had sent, making it easier for Defendant He to obtain other managerial approval of checks he would prepare to pay the invoices from CCL Los Angeles. This email also had the effect of hiding from Schenker the fact that Defendant He had caused it to organize and be invoiced for services relating to the Shenzhen Shipments, because CCL Los Angeles' acceptance of the checks Defendant He would prepare caused the outstanding invoices from CCL Shenzhen to be resolved.

xvii. On September 14, 2012, Defendant He sent an email to Lucy Chen of CCL Los Angeles attaching 17 invoices Schenker had received from CCL Shenzhen. In the email Defendant He attached copies of checks made out to CCL Los Angeles and paid by Schenker that Defendant He said he "will send out via UPS today." Defendant He requested that Ms. Chen use the checks to "kindly help to pay CCL SZX [Shenzhen]." This email again misrepresented that Schenker had organized the services that CCL Shenzhen

had performed and invoiced Schenker for, when in fact Defendant He knew that Schenker had no knowledge of these services and that the Enterprise would receive all of the revenue generated from the services. This email also had the effect of hiding from Schenker the fact that Defendant He had caused it to organize and be invoiced for services relating to the Shenzhen Shipments, because CCL Los Angeles' acceptance of the checks Defendant He prepared caused the outstanding invoices from CCL Shenzhen to be resolved.

xviii. On November 29, 2012, Defendant He sent an email to Lucy Chen of CCL Los Angeles attaching seven invoices Schenker had received from CCL Shenzhen. In the email Defendant He wrote that he would "cut checks for attached invoices . . . and will over night the checks to your office. You should rec'd the package tomorrow." Defendant He requested that Ms. Chen "pls help to pay CCL SZX [Shenzhen] to clear these invoices." This email again misrepresented that Schenker had organized the services that CCL Shenzhen had performed and invoiced Schenker for, when in fact Defendant He knew that Schenker had no knowledge of these services and that the Enterprise would receive all of the revenue generated from the services. This email also had the effect of hiding from Schenker the fact that Defendant He had caused it to organize and be invoiced for services relating to the Shenzhen Shipments, because CCL Los Angeles' acceptance of the checks Defendant He prepared caused the outstanding invoices from CCL Shenzhen to be resolved.

xix. On January 7, 2013, Defendant He sent an email to Paul of CCL Shenzhen that attached an email Defendant He had received from Lucy Chen of CCL Los Angeles on January 2, 2013. Ms. Chen's email attached 13 invoices that Schenker had received from CCL Shenzhen. In the email to Paul, Defendant

He asked him to "Pls see attached e-mail, those invoices were paid to CCL USA last week, and I will send another check to CCL USA office with amount $28461 today. And then I will send ont more check with the Nov invoice next week." Defendant He also explained that he was sending separate checks for each invoice because "I want to make sure payment to be made on schedule" and also because "I need to make sure I have enough cash float for my team weekly, so I need to cut check separately." Defendant He also begged Paul to "Pls be patient, I will get all these clear per the schedule I provided to you. Thanks for your understanding." This email again misrepresented that Schenker had organized the services that CCL Shenzhen had performed and invoiced Schenker for, when in fact Defendant He knew that Schenker had no knowledge of these services and that the Enterprise would receive all of the revenue generated from the services. This email also stated falsely that Defendant He had to prepare separate checks for outstanding invoices from CCL Shenzhen because doing so would leave him enough "cash float" for his team and result in prompt payments. The real reason was that Defendant He required higher-level approval for Schenker checks of an amount above $15,000. Defendant He lied about this fact so that CCL Shenzhen and CCL Los Angeles would not discover that Schenker had no knowledge of the services Defendant He had ordered from CCL Shenzhen, which would have caused the revenue the Enterprise was obtaining from those services to cease.

xx. On February 12, 2013, Defendant He sent an email to Lucy Chen of CCL Los Angeles attaching 11 invoices Schenker had received from CCL Shenzhen. In the email Defendant He wrote that he would send a check to cover the invoices that CCL Los Angeles would receive "by UPS tomorrow." This email again misrepresented that Schenker had organized

the services that CCL Shenzhen had performed and invoiced Schenker for, when in fact Defendant He knew that Schenker had no knowledge of these services and that the Enterprise would receive all of the revenue generated from the services. This email also had the effect of hiding from Schenker the fact that Defendant He had caused it to organize and be invoiced for services relating to the Shenzhen Shipments, because CCL Los Angeles' acceptance of the checks Defendant He prepared caused the outstanding invoices from CCL Shenzhen to be resolved.

xxi. On March 7, 2013, Defendant He sent an email to Lucy Chen of CCL Los Angeles attaching 9 invoices Schenker had received from CCL Shenzhen. In the email Defendant He wrote that he had placed in the mail a check from Schenker for $31,636.00 to cover the invoices that Ms. Chen would receive "either tomorrow or next Monday." This email again misrepresented that Schenker had organized the services that CCL Shenzhen had performed and invoiced Schenker for, when in fact Defendant He knew that Schenker had no knowledge of these services and that the Enterprise would receive all of the revenue generated from the services. This email also had the effect of hiding from Schenker the fact that Defendant He had caused it to organize and be invoiced for services relating to the Shenzhen Shipments, because CCL Los Angeles' acceptance of the checks Defendant He prepared caused the outstanding invoices from CCL Shenzhen to be resolved.

69. The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

70. The Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

71. As a direct and proximate result of the Defendants' racketeering activities and

violations of 18 U.S.C. § 1962(c), Schenker has been injured in its business and property by paying for hundreds of thousands of services for which it received no revenue.

**COUNT II**

**RICO § 1962(d)**

72. The allegations of paragraphs 1 through 71 are incorporated herein by reference.

73. This count is against all of the named Defendants.

74. As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. § 1962(c) by conducting and participating in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

75. The Defendants knew that their predicate acts as detailed above were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

76. As a direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Schenker has been injured in its business and property by paying for hundreds of thousands of services for which it received no revenue.

**COUNT III**

**Breach of duty of loyalty**

77. The allegations of paragraphs 1 through 76 are incorporated herein by reference.

78. This count is against Defendant He.

79. As an employee of Schenker and an Ocean Import Manager, Defendant He owed a duty of undivided loyalty to Schenker under California law. Under that duty of loyalty, Defendant He could not take actions that were inimical to the best interests of Schenker, he could not acquire a material benefit from a third party in connection with transactions conducted on behalf of Schenker though the use of his position as an Ocean Import Manager, and he could not use Schenker's property or confidential information for his own purposes or for those of a third party.

80. Defendant He breached his duty of loyalty by organizing and paying for freight forwarding services by using Schenker's resources and his position as a Schenker employee, but then concealing the expenses he caused Schenker to pay and purposely not sending invoices to any third party that would cause Schenker to collect revenue for the services. Defendant He also breached his duty of loyalty by personally receiving money from the other Defendants after those Defendants sent invoices to third parties for the freight forwarding services that Defendant He had organized. Defendant He kept for himself money that should have been paid to Schenker.

81. By running his own freight forwarding operation out of Schenker's office and causing Schenker to pay all the costs while he and other Defendants were provided with all the revenue, Defendant He took actions that were inimical to the best interests of Schenker and acquired material benefits from third parties as a result of transactions he conducted on the behalf of Schenker.

82. Defendant He's numerous breaches of his duty of loyalty to Schenker proximately caused damages to Schenker in the form of the expenses Defendant He caused Schenker to pay without receiving any corresponding revenue.

83. In breaching his duty of loyalty to Schenker, Defendant He acted with oppression, fraud and malice under Cal. Civ. Code § 3294(a).

## COUNT IV

## Aiding and abetting breach of duty of loyalty

84. The allegations of paragraphs 1 through 83 are incorporated herein by reference.

85. This count is against Defendant Kong, Defendant ACS, Defendant Ho, and Defendant Ho d/b/a Leader Expedite ("the Non-Employee Defendants").

86. Each of the Non-Employee Defendants knew that Defendant He was an employee of Schenker and accordingly had a duty of undivided loyalty to Schenker. Each of the Non-Employee Defendants also knew that Defendant He breached his duty of loyalty by organizing freight forwarding services with Schenker's resources, causing Schenker to pay for those services and then concealing these payments from Schenker, and then purposely not sending invoices to any

third party that would cause Schenker to receive any revenue for the services.

87. The Non-Employee Defendants consciously chose to participate in tortious activity by assisting Defendant He in his breach of duty of his duty of loyalty and providing substantial assistance or encouragement. The Non-Employee Defendants did this by requesting and accepting information relating to the shipments and deliveries that Defendant He organized and then submitting invoices containing that information to third parties that had requested the shipments and deliveries. When these invoices were paid, the Non-Employee Defendants then divided the revenue they received among themselves and Defendant He, thus causing Defendant He and the Non-Employee Defendants to be unjustly enriched while Schenker was entirely deprived of the revenue it should have received for the services.

88. The Non-Employee Defendants' substantial assistance or encouragement of Defendant He's breach of his duty of loyalty was a substantial factor in causing significant damage to Schenker.

89. In aiding and abetting Defendant He's breach of his duty of loyalty, the Non-Employee Defendants acted with oppression, fraud and malice under Cal. Civ. Code § 3294(a).

## COUNT V

## Fraud

90. The allegations of paragraphs 1 through 89 are incorporated herein by reference.

91. This count is against Defendant He.

92. By concealing expenses that he caused Schenker to pay when he organized freight forwarding services through his authority as a Schenker employee, Defendant He misrepresented to Schenker the expenses he had caused Schenker to pay and concealed services that should have provided Schenker with revenue. As a result of Defendant He's concealment, Schenker did not know both that it had incurred expenses for the services Defendant He organized and that it was entitled to revenue from those services.

93. As discussed above, Defendant He concealed the expenses by deliberately placing them in shipment files that were unrelated to the services he had organized but that had sufficient

profit margins to not trigger any of Schenker's internal accounting controls. Defendant He also concealed the expenses by offsetting them against payments that were owed to Schenker by CCL Los Angeles, again without Schenker's knowledge or consent.

94. Between approximately April 2012 and March 10, 2013, Defendant He also misrepresented to next-level Schenker managers the purpose for which he sought their approval and signatures on checks Defendant He had prepared to be paid to CCL Los Angeles. Defendant He falsely represented that the checks were for legitimate Schenker business, when they in fact were to pay for freight forwarding services that Defendant He had organized without Schenker's knowledge and which would provide no revenue to Schenker because of Defendant He's misdeeds.

95. Defendant He knew that he was organizing freight forwarding services that Schenker would pay the expenses for but receive no revenue and that the revenue would instead go to Defendant He and the other Defendants. Defendant He also knew that, by concealing the expenses he caused Schenker to pay by hiding them in unrelated shipping files and improperly offsetting them against payments due to Schenker from CCL Los Angeles, he was misrepresenting the expenses that Schenker incurred because of his actions. Defendant He also knew that the checks for which he sought approval between April 2012 and March 10, 2013 were not for legitimate Schenker business, yet he falsely represented that they were.

96. Defendant He took all of these actions with the intent to defraud Schenker and cause Schenker to rely that he was not concealing expenses he had caused Schenker to pay or stealing revenue that should have been paid to Schenker.

97. Schenker justifiably relied on the misrepresentations Defendant He provided when seeking approval of checks he had prepared and also trusted that Defendant He was not concealing expenses he had caused Schenker to pay or taking actions to acquire for himself revenue that should have been paid to Schenker. Schenker justifiably relied that its employee was not participating in an elaborate scheme to steal hundreds of thousands of dollars.

98. Defendant He's concealment of expenses and misrepresentations proximately caused damages to Schenker in the form of the expenses Defendant He caused Schenker to pay

without receiving any corresponding revenue.

99. In defrauding Schenker, Defendant He acted with oppression, fraud and malice under Cal. Civ. Code § 3294(a).

## COUNT VI

## Aiding and abetting fraud

100. The allegations of paragraphs 1 through 99 are incorporated herein by reference.

101. This count is against Defendant Kong, Defendant ACS, Defendant Ho, and Defendant Ho d/b/a Leader Expedite ("the Non-Employee Defendants").

102. Each of the Non-Employee Defendants knew that Defendant He was defrauding Schenker by concealing expenses he had caused Schenker to pay within unrelated shipping files and by improperly offsetting them against payments due to Schenker from CCL Los Angeles. Each of the Non-Employee Defendants also knew that Defendant He was misrepresenting the purpose of checks on which he obtained a second signature between April 2012 and March 10, 2013.

103. The Non-Employee Defendants consciously chose to participate in tortious activity by assisting Defendant He in his fraud and providing substantial assistance or encouragement. The Non-Employee Defendants did this by requesting and accepting information relating to the shipments and deliveries that Defendant He organized and then submitting invoices containing that information to third parties that had requested the shipments and deliveries. When these invoices were paid, the Non-Employee Defendants then divided the revenue they received among themselves and Defendant He, thus causing Defendant He and the Non-Employee Defendants to be unjustly enriched while Schenker was entirely deprived of the revenue it should have received for the services that Defendant He concealed.

104. The Non-Employee Defendants' substantial assistance or encouragement of Defendant He's fraud was a substantial factor in causing significant damage to Schenker.

105. In aiding and abetting Defendant He's breach of his duty of loyalty, the Non-Employee Defendants acted with oppression, fraud and malice under Cal. Civ. Code § 3294(a).

## PRAYER FOR RELIEF

WHEREFORE, Schenker requests that this Court enter judgment in its favor on each count set forth above and award it:

a. All compensatory damages to which it is entitled, which exceed $500,000;

b. Treble compensatory damages for damages awarded under Counts I and II, pursuant to 18 U.S.C. § 1964(c);

c. Punitive damages under Counts III, IV, V, and VI;

d. All costs for bringing suit, including attorney's fees, pursuant to 18 U.S.C. § 1964(c);

e. Prejudgment and post judgment interest; and

f. Any such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Schenker demands a trial by jury.

Dated: August 23, 2016

VALOREM LAW GROUP, LLP

By: */s/ Mark Sayre*

Mark Sayre
VALOREM LAW GROUP
29212 Las Brisas Road
Valencia, California 91354
Mark.sayre@valoremlawcom
(408) 940-0044 (telephone)
(408) 915-2672 (facsimile)

Nicole Auerbach, IL Bar No. 6217095 (*pro hac vice application pending)*
Daniel Wucherer, IL Bar No. 6304338 (*pro hac vice application pending)*
VALOREM LAW GROUP LLP
35 E. Wacker Dr., Suite 3000
Chicago, IL 60601
nicole.auerbach@valoremlaw.com
daniel.wucherer@valoremlaw.com
(312) 676-5460 (telephone)
(312) 676-5499 (facsimile)

*Attorneys for Schenker, Inc.*